Matter of Renee R. v Glen F. (2004 NY Slip Op 50654(U))

[*1]

Matter of Renee R. v Glen F.

2004 NY Slip Op 50654(U)

Decided on May 7, 2004

Family Court, Monroe County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on May 7, 2004

Family Court, Monroe County
In the Matter of a Proceeding under 
 Article 6 of the Family Court Act, RENEE R., Petitioner, against
GLEN F., Respondent.
V01989-94/03F

Marilyn L. O'Connor, J.
The above cases have a complex, intertwined history. By order of September 28, 1994, the mother, Renee R. (f/k/a O.), and the father, Glen F., had joint custody of Ned A. R. ("Ned", DOB 1/30/94), with physical residence to the mother. On December 14, 2001, fearing Renee R. was going to move out of state, Glen F. filed a petition to share physical residence of Ned equally. Renee R. responded with a petition confirming she planned to move out of state to marry the father of her daughter Kris R.(DOB 7/9/89), and seeking a modification of visitation to accommodate her intended move. Therefore, on February 15, 2002 the father filed an amended petition for physical residence of Ned, but not seeking sole custody. Shortly after the filing of these petitions, a neglect/abuse proceeding was filed March 19, 2002, and Ned and Kris were removed from Renee R.'s home. Kris was removed on or about March 19, 2002 and placed with her grandmother. On or about April 18, 2002 both children went to live with their maternal aunt Aimee R.. 
[*2]
By decision dated July 15, 2002 after a 1028 hearing regarding Renee R.'s request for return of Ned, the court refused to return Ned. The court found imminent danger to Ned and, among other things, that Renee R. had apparently choked Ned in anger, had been verbally and physically abusive to Kris, and had failed to believe her daughter's allegations that her father had sexually abused her or to take any actions to protect her. Renee R. was found by consent to have neglected both of her children on July 22, 2002.
In September 2002 Ned moved in with his father, Glen F., pursuant to an order from the September 23, 2002 custody proceedings. That order, signed October 28, 2002, provided Renee R. and Glen F. with joint custody of Ned, with primary residence to the father and with the mother's visitation to be determined by the Department of Social Services (hereinafter the "Department", n/k/a Department of Human and Health Services) because of the neglect/abuse proceeding. Thereafter, on November 27, 2002, the court found in the neglect/abuse matter against Kris's father, David O. (the mother's boyfriend and ex-husband), that he had severely sexually abused Kris. Additionally, on May 29, 2003, Renee R. was found to have pressured Kris to recant regarding the sex abuse allegations. This was determined to be a wilful violation an order of protection not to discuss the neglect case with her children.
By the above-captioned proceedings (V1989-94/03F and NA 137-02/03A), the mother is attempting to regain custody of Ned. First, on March 21, 2003 Renee R. filed a petition in the neglect/abuse case seeking, inter alia, to have the Department allow Ned R. to be placed in her care and custody under its supervision pending modification of a custody order in the custody/visitation case.[FN1] Second, on May 8, 2003 Renee R. filed a modification petition in the custody/visitation case for primary physical residence with respect to Ned. She claimed a change of circumstances in that she had completed the requirements of the order of disposition in the neglect proceeding and that it would be in the best interests of Ned to be returned to her for purposes of primary residence. For the reasons set forth below, the mother's petitions for both primary physical residence and modification of the placement order with respect to Ned are denied. Glen F. shall continue to have primary physical residence of Ned.
The trial of these matters took place over the course of two days. After the close of evidence, Ned's father, the law guardian and the Department all moved to have Renee R.'s petitions dismissed. The motion was denied. However, the court now finds that the evidence clearly established that any change of circumstances was inadequate to justify a change of physical residence from the father to the mother. Furthermore, even if the case had been a de novo custody trial, Ned's best interests clearly require that he continue to reside primarily with his [*3]father. In reaching this decision, the court takes judicial notice of all prior proceedings and orders in the cases involving the parties. They strongly support a denial of the mother's request for a change of custody.
Additionally, a review of the evidence reveals not a single witness whose testimony supported a change of physical residence to the mother. All the evidence supported a finding that the father provided a much more stable home for the boy than did the mother, even though the father was necessarily using an extensive support system to make sure the boy was properly cared for at all times. The mother was also living with her mother and the mother's boyfriend in their house, and thus require an extensive support system to support herself, to say nothing of a child. Significantly, she had moved in with her own mother and boyfriend only shortly before trial. She clearly did not have either the personal or financial ability to provide for Ned on her own. The father, on the other hand, is financially and personally able to provide for Ned, but because he works nights, he has had to arrange for friends and relatives to help him care for Ned on a regular basis. His arrangements, though complex, are working for Ned, and they are superior to the mother's various short-comings and inability to provide the boy with a home on her own.
Also favoring the father is the fact that the evidence clearly demonstrated that one of the main care givers for Ned is his aunt, i.e., his mother's sister, Aimee R., who initially had physical custody of Ned under the neglect proceeding against Renee R.. The relationships are important because the directly impact Ned. This is his family. Aimee R. still has custody Kris. Until just one to two weeks before the trial, Renee R. had not even been getting along with her own sister. Their fighting had been traumatizing for Ned. However, the father has clearly gotten along well with the mother's own sister throughout the relevant time periods. The mother's serious underlying problem in her critical adult sibling relationship contrasts unfavorably with the father's strong, working relationship with the boy's aunt. The mother's significant inability to get along with her own sister was perhaps only resolved hopefully for goodunder the pressure of imminent trial. Furthermore, the evidence proved that Ned liked being with his aunt, who kept a room for him at her old and new homes.
The evidence also consistently established that the boy did not want to reside with his mother, but wished to stay with his father. The evidence even showed Ned sometimes reacted very badly to the knowledge that his mother was trying to take him away from the father. Monica Devine, the boy's art therapist for more than a year by the time of trial, was one of the mother's witnesses. Nonetheless, her testimony strongly favored the father. Devine explained that Ned's current treatment goals were to develop more adaptive responses to anxiety. Her testimony included that in March of 2003, when Ned was very angry at his mother and his mother was filing her petition in this neglect/abuse case, Ned had explained to Devine that "he was worried about a custody case and that he felt that his mother was trying to get custody of him". Devine testified further that Ned commented he was going to kill himself and that she was therefore immediately asked by the father and the school to see him. She also said, "He stated that he did not want to live with his mother at that time." Since making those comments, Devine explained that she had spoken with him again about the possibility of living with his mother. According to Devine, "After that one incident Ned did say to me that he enjoyed living with Aimee and also with his father, but would not comment on if he wanted to live with his mother or not." This occurred around May of 2003. Devine stated he had told her he knew [*4]about the court proceedings and that "it makes him feel anxious". She quoted him as saying, "I know there is court and I'm scared that my mother is going to get custody of me".
Additionally, Devine testified to the ill effect on Ned from a lack of visitation due to the mother's own decisions. At one time, despite the pending actions in which she seeks relief, the mother admittedly refused to exercise visitation because it was required to be supervised. This was a poor and very self-centered choice. She even told Devine she would not visit the boy if the visits were monitored. Another time she considered moving away. According to Devine, Renee R. said she thought her moving away would remove Ned from the conflict and be best for him. The mother, in her subsequent testimony, admitted she said these things. This unfortunate behavior makes little or no sense when compared to Devine's testimony that Renee R. was at one point so teary and upset with the limited contact she had with her children that Devine suggested she contact her therapist.
Additionally, when asked what Ned told her about missing his mom when there was no visitation for a period, Devine said, "At that time he expressed anger towards her for not visiting with him, and at one period of time he thought that she was moving away and expressed sadness that he might not ever see her again." Devine acknowledged that Ned thought she was choosing not to visit him. That was indeed true altogether too often and shows the negative impact of mother's behavior on her son.
Devine testified that she had three joint sessions with Ned and his mother, and that the last session, which had been two weeks before her testimony at the trial, went well. According to her, the two listened to each other and validated each other's feelings, Renee appeared flexible, and there were no problems with the session. She indicated she had not done a recent session with Ned and his father because she uses the sessions as Ned needs them. Thus, she had not requested a joint session with father and son since the spring. Devine also confirmed that Ned has a close relationship with his aunt, and that he had reported his mother and aunt fighting, with his mother screaming, and that this scared him. She further stated that in the spring the mother had expressed anger with her as a therapist over the phone, and with Child Protective workers. Devine also testified that she had seen the father and the aunt, but not the mother, be physically affectionate with the boy.
The evidence shows that Renee R. does not have the best interests of her son in mind. She remains more concerned with her own interests, just as she had been with her daughter Kris when she refused to believe that her boyfriend had repeatedly sexually abused the girl. While the mother has made progress and that visitation with the mother no longer needs to be supervised, the mother remains a person who needs to continue to improve her own emotional and economic stability. She needs to recognize that every step forward she may make does not make her the parent who should be rewarded with a change of custody. Instead, she needs to demonstrate to her son that she can be a good mother without making Ned afraid that she will try to take him away from his father and his aunt. The boy is somewhat fragile, having problems of his own, and he appears to be doing well at this time. His progress should not be disturbed.
The mother's therapist, Jay Pruiett, testified that "adjustment disorder" was Renee R.'s primary diagnosis, and that he was working with her regarding a number of adjustment difficulties and emotional reactions, including depression and anxiety. He confirmed that Renee R. had suffered from suicidal ideation in early 2003. He testified that she had talked to him [*5]several times about leaving town. Obviously, this was not a good reaction to a difficult situation, and it undermines her quest for physical residence of Ned. Pruiett said that the mother explained that her anger, which she had a difficult time controlling, was caused by frustration. In spite of the mother's history of losing her temper with the children, strangely he had never yet talked with her about losing her temper with Ned. This was a serious omission in the treatment of the mother since she had been credibly accused of physically abusing both children and of using inappropriate corporal punishment. This court previously wrote, after a 3-day trial in June of 2002, addressed to the mother's request for return of Ned in the neglect action,
The clear existence of the mother's bad temper lends great credibility to the children's individual disclosures of a history of physical abuse by the mother e.g., choking, head banging, and hitting. Additionally, the mother's improper mental and emotional reactions to her daughter, including disbelieving her regarding the sex abuse allegations and blaming the girl instead of O. for the mother's troubles, reveal a critical lack of balanced judgment.
Pruiett's testimony confirmed that the mother continued to be angry at her daughter for "misrepresent[ing] facts" regarding putting her head through a wall "in a way that was different than she saw it". Thus, despite this court's prior findings based on ample evidence, this new testimony continues to support a conclusion that Renee R. still is not dealing well with the reality of her anger toward her children. Indeed, her response is particularly disturbing when evaluating her parenting abilities. Pruiett testified that her doctor had prescribed medicine for her emotional problems, that her symptoms were greatly reduced, that he was working with her on an as needed basis, but she was not discharged from his care.
Ralph Fleming, the live-in "significant other"/boyfriend of petitioner's mother, testified in a supportive manner about Renee R., but his testimony was inadequate to result in a change of physical residence. Fleming explained Renee R. had moved in with them a couple months earlier, and that he had observed her interacting well with Ned playing games, getting ice cream, doing homework together, hugging, kissing, and talking. He also explained an instance in which he had observed Renee walking away from a loud conflict with her brother, taking Ned with her. Fleming said, "I think maybe six months ago she would have probably lost her cool, maybe she would have struck out more or something" but this time she was "pretty calm".
When Renee herself testified, she admitted to seeing therapists and currently taking medication for depression. She testified she had not had suicidal thoughts in a few months and now had more support systems. She explained what she had learned from sessions in an anger management program, and pointed out two times she had used her training. Once was with respect to her brother, as mentioned above, and once was in the courthouse when there was a loud conversation between her mother, her sister and Ned's father. She said she could see her mother getting upset, and told her she did not have to do that now and got her to walk away. Renee explained that she has been in counseling for anger management, depression and dealing with her emotions, that she is on medication for depression, and that she is now able to utilize anger management techniques. She claimed that when she and her sister got in a fight, she never raised her voice. This contradicted Ned's version of the facts, according to Devine.
Renee R. admitted having had a two-month break in visitation and learning that her son wanted to kill himself because of her. She said she asked Devine for help as to what she should do when she started seeing him again in mid-March with supervised visitation. Now she sees [*6]him alternate weekends and every Wednesday. She testified credibly that she had learned how to administer reasonable consequences for bad behavior and that she knew how to work with him on his homework.
She talked about her work history, explaining she had worked two jobs, but was now working one permanently, Monday through Friday, 8:30 to 5 PM, which are clearly better hours for caring for a child than the father's hours. She also testified to her various moves due to financial issues and admitted period of no contact with Ned lasting as long as a month, and that she had refused supervised visits. She testified she is now paying child support. She testified that she has gone to Ned's basketball practices and games and attended his parent teacher conferences.
On cross examination she admitted that Ned loves her sister, and that it was possible contact with her might be interrupted due to the hostility between the two women. This, obviously, would be a serious blow to Ned. She said she thought Ned was doing "great" and denied hearing any recent talk of suicide from him. Again she was forced to admit to her sporadic visitation record.
The only conclusion the court can responsibly reach from the mother's testimony alone is that she still presents a risk of mental health, relationship, and economic instability to her son, whom even she admits under the current circumstances is doing "great". Renee R. simply has presented no reason to change physical residence to her other than her desire to get her children back and her normal daytime, Monday through Friday, work hours. This is not enough, particularly for a lady with such a poor, recent record with respect to caring for her children. There is no reason to remove Ned from a living situation in which he is happy and prospering in order to transplant him to one he does not want and which would clearly make him unhappy, if not suicidal. The mother should recognize and accept that what she wants is not what is best for her child. To date she has seemed incapable of doing so.
The father's testimony was clear that he was and presumably still is reasonably and responsibly involved in Ned's school and health issues. Among other things he explained that Ned was legitimately attending the Greece school district, where he has always gone to school, even though he lives in the city. He testified that Greece allows Ned to attend from Aimee R.'s address as a babysitter, and that he owns a house in Greece, in which his own father lives. This explanation was not rebutted.
Even on cross-examination he presented a credible image of a relaxed person who utilizes a strong support system in order to care for Ned.
The only other witness for the father was Aimee R.. The mother's sister testified that until just one week before her testimony she and her sister were not speaking. She also testified to having custody of Kris, to various activities she shares with Ned, and to Ned going back and forth without wanting to see his mother more. Clearly, she lends support to Ned's physical residence remaining happily with his father.
NOW THEREFORE, due deliberation having been had, and for the reasons set forth above, it is
ORDERED that Renee R.'s petition (V 1989-94/03F) for physical residence of Ned R. (DOB 1/30/94) in the custody case with Glenn F. is denied; and it is further
ORDERED that Renee R.'s petition (NA 137-02/03A) for modification of the order in the [*7]neglect/abuse case to have the Monroe County Department of Human and Health Services place Ned R. with her is denied; and it is further
ORDERED that Renee R. shall have such visitation with Ned R. as she, the mother, and Glenn F., the father, shall from time to time agree; and it is further
ORDERED that the Department's petition (NA 137-02/03B) for an extension of the order in the neglect/abuse case involving Ned R. is denied and with the Department's consent dismissed as unnecessary since Ned is now in the custody of his father, Glenn F..
DATED: May 7, 2004
Rochester, N.Y. HON. MARILYN L. O'CONNOR
 FAMILY COURT JUDGE
Footnotes

Footnote 1: On March 12, 2003, the Department had filed a routine extension petition (NA 137-02/03B), which remains pending regarding Ned. Renee R.'s petition filed shortly thereafter not only sought to have Ned live with her, it also sought immediate visitation with her daughter, Kris R. (DOB 7/9/89) and appropriate family counseling. That counseling was agreed to on April 23, 2003. On July 18, 2003 it was agreed that Kris would remain in the custody of Aimee R., with visits by Renee, counseling paid for by the Department, and visits to be arranged between Renee R. and Aimee R., with input from the therapist. Because sole custody was given to Aimee R., Kris was removed from the neglect order previously filed in NA 136/137-02, and the issues with respect to Kris raised by Renee R.'s petition were resolved, leaving only Ned's status at issue.